## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VICTOR OMAR BONILLA ALVAREZ,

       *Petitioner*,

    v.

KRISTI NOEM, *et al.*,

       *Respondents*.

Civil Action No. 25-03136 (AHA)

### <u>Order</u>

According to the record before the Court, Victor Omar Bonilla Alvarez escaped years of torture and abuse at the hands of MS-13 and law enforcement in El Salvador. He has no criminal record, having even been exonerated and acquitted of the Salvadoran prosecutions that led to his abuse. Just in March, an immigration judge in this country found Bonilla Alvarez will likely face torture again if returned to El Salvador.

That should have mattered to us. Our pledge against aiding foreign torture was a collective one. In 1988, President Reagan signed the Convention Against Torture, promising not to send a person somewhere with "substantial grounds for believing that he would be in danger of being subjected to torture."[1] In 1990, President George H.W. Bush worked with the Senate toward ratifying that promise.[2] And in 1998, President Clinton worked with both chambers in Congress to enshrine the promise in our own law: "It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture."[3]

---

[1]   Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 113.

[2]   S. Exec. Rep. No. 101-30, at 2, 4 (1990).

[3]   Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681–822 (codified at 8 U.S.C. § 1231 note).

It did not matter. We sent Bonilla Alvarez to Guantanamo Bay—for reasons unexplained, beyond a press release pronouncing him the "worst of the worst." When his lawyer argued that was illegal, we moved Bonilla Alvarez to Mexico, where he now may apparently—and imminently—be given to El Salvador.

This appears to be not exception or mistake, but design. In recent weeks, we have moved others to third countries only for them to be forwarded to a country we know is likely to torture or persecute them. Bonilla Alvarez asks this Court to intervene on an emergency basis but, as the courts before this one have concluded, it does not have jurisdiction to do so.

## I.    Background

Bonilla Alvarez is a native of El Salvador. ECF No. 1 at 1–2. According to his habeas petition, he first arrived in the United States as a teenager in 2010, having fled El Salvador due to threats against him and his family because he refused to join MS-13. *Id.* ¶¶ 8–9. Bonilla Alvarez obtained special immigrant juvenile status in the United States, but when his father was shot he returned to El Salvador to care for him before obtaining lawful permanent resident status. *Id.* ¶¶ 8, 10–13. Back in El Salvador, Bonilla Alvarez was targeted by Salvadoran law enforcement and MS-13 with harassment and false charges over a period of about a decade. *Id.* ¶¶ 8, 14–30. He was detained for multiple years and was tortured. *Id.* The courts of El Salvador eventually granted Bonilla Alvarez habeas corpus, ordering his release from detention, and he fled El Salvador in September 2024. *Id.* ¶¶ 27, 30. Bonilla Alvarez arrived in the United States through the Mexican border and presented himself to border patrol officials in November 2024. *Id.* ¶ 31.

According to the government, U.S. Customs and Border Protection immediately began to process Bonilla Alvarez for expedited removal. ECF No. 9 at 2. Because Bonilla Alvarez expressed a fear of returning to El Salvador, an asylum officer conducted a credible fear interview and then referred him for removal proceedings before an immigration judge. *Id.* Bonilla Alvarez says he

presented the immigration judge with copies of Salvadoran court records showing his innocence of any criminal wrongdoing. ECF No. 1 ¶ 33. The government "did not produce any countervailing evidence nor otherwise impeach [Bonilla Alvarez's] evidence regarding his actual innocence." *Id.* ¶ 36.

In March 2025, the immigration judge issued a final removal order for Bonilla Alvarez but granted him withholding of removal to El Salvador under regulations implementing the Convention Against Torture. *Id.* ¶¶ 38–40; ECF No. 9 at 2; *see* ECF No. 7-1. The government detained Bonilla Alvarez for roughly three months and then, in June 2025, moved him to Guantanamo Bay. ECF No. 1 ¶¶ 44–46; ECF No. 9 at 2–3.

Bonilla Alvarez's lawyer sent the government a letter in July 2025 reiterating that his client was subject to a judicial order preventing his return to El Salvador and urging the government to provide notice and process before removing him to any third country. ECF No. 7-2. On September 12, 2025, Bonilla Alvarez filed a habeas petition in this Court, challenging the legality of his detention in Guantanamo and the legality of any planned removal to a third country. ECF No. 1 ¶¶ 75–99.

On September 21, without informing Bonilla Alvarez's counsel, the government moved him to a facility in Arizona. ECF No. 9 at 3. The next day, it removed him to Mexico and left him in the custody of the Mexican government. *Id.* Bonilla Alvarez maintains he was transferred involuntarily; the government claims he agreed to go. ECF No. 11 ¶ 5; ECF No. 9 at 3.

According to Bonilla Alvarez, he was kept in a detention facility in Mexico, which arranged for a visit by Salvadoran consular officials. ECF No. 7 ¶¶ 42–44. On September 25, facility officials told him further that he would be sent to El Salvador in seventy-two hours unless he obtained asylum within that time period. *Id.* ¶ 47. The next day, Bonilla Alvarez filed a motion for a temporary restraining order ("TRO") and order to show cause in this Court. ECF No. 7. He

asks the Court to order the U.S. government to facilitate his return to U.S. custody or, alternatively, to order the U.S. government to notify Mexico not to remove Bonilla Alvarez to El Salvador or other countries where he fears persecution or torture. *Id.* ¶ 61.

The Court held a prompt hearing. At the hearing, the government was unable to provide any answers—government counsel had not even been given notice that Bonilla Alvarez would be removed to Mexico even though the case had been pending. Draft Hr'g Tr. at 24 (Sept. 26, 2025). The government filed its opposition and further submissions the next morning, indicating it removed Bonilla Alvarez to Mexico without any specific assurances about whether he would be sent to El Salvador. ECF No. 9-1.

## II.    Discussion

The Court lacks jurisdiction to order the relief Bonilla Alvarez asks for. A TRO "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). In addition to showing irreparable harm and that the equities and public interest favor him, Bonilla Alvarez must show he is likely to succeed on the merits. *Id.* at 20; *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011). That includes that he will be able to establish this Court's jurisdiction. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

Bonilla Alvarez has not made that showing here. As another court in this District recently observed, when a noncitizen has already been removed to another country, "there is no question" courts lack the power to order the executive branch to undertake particular actions with the foreign nation. *D.A. v. Noem*, __ F. Supp. 3d __, __, No. 25-cv-3135, 2025 WL 2646888, at *7 (D.D.C. Sept. 15, 2025). There too, an immigration judge had found that each of the five plaintiffs would likely face persecution, torture, or death in their home countries. *Id.* at *1. By the time the plaintiffs sought relief, the government had removed them to Ghana, and the court held it lacked the power

to order the executive branch to order Ghana to keep the plaintiffs there, or to order the executive branch to notify Ghana not to remove the plaintiffs to their countries of origin. *Id.* at *7. The court explained that it lacked statutory or equitable authority to order the executive branch to undertake communications with a foreign nation. *Id.* at *7–8. The same reasoning applies here. This Court does not have jurisdiction over Mexico, and while it does have jurisdiction over U.S. officials, Bonilla Alvarez has not made the kind of showing that has allowed courts to direct the government to facilitate an individual's return. *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) (en banc) (noting that "courts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy"); *D.A.*, 2025 WL 2646888, at *8 & n.3 (distinguishing cases where the government was ordered to return noncitizens after conceding they were removed in error).

Bonilla Alvarez suggests this case is different because it was filed as a habeas petition, not a civil complaint for injunctive relief. Draft Hr'g Tr. at 14–15; *see D.A.*, 2025 WL 2646888, at *1. But counsel could not identify any authority for that proposition. Draft Hr'g Tr. at 19. As the government points out, Bonilla Alvarez's removal from the United States raises questions as to whether his habeas petition—which challenges, and is therefore premised on, detention—is moot. ECF No. 9 at 13–14; *see Han v. Lynch*, 223 F. Supp. 3d 95, 104 (D.D.C. 2016) (noting that "a habeas petition becomes moot when the detention that the petitioner is challenging is over"); *In re Petitioners Seeking Habeas Corpus Relief in Rel. to Prior Detentions at Guantanamo Bay*, 700 F. Supp. 2d 119, 137 (D.D.C. 2010) (concluding that "once a Guantanamo detainee is transferred or released to a foreign country, his petition becomes moot").

It would be a different circumstance if Bonilla Alvarez were still in the custody of U.S. officials—courts have granted temporary injunctive relief to noncitizens who have filed habeas petitions and showed concern of removal to third countries that might send them to countries likely

5

to torture or persecute them. *See, e.g.*, *Garcia-Ayala v. Andrews*, No. 25-cv-02070, 2025 WL 2597508 (E.D. Cal. Aug. 8, 2025); *Misirbekov v. Venegas*, __ F. Supp. 3d __, No. 25-cv-00168, 2025 WL 2201470 (S.D. Tex. Aug. 1, 2025). Although Bonilla Alvarez makes allegations that U.S. officials maintain control over what Mexico does next, the record is not developed on that point. ECF No. 7 ¶¶ 33–34, 49. And while the Supreme Court's guidance here has been obscure, things might also be different if Bonilla Alvarez shows he was "improperly" removed from the United States, which he has not done at this stage. *Noem v. Abrego Garcia*, 604 U.S. __, __, 145 S. Ct. 1017, 1018 (2025) (recognizing it was proper to require the government to facilitate plaintiff's release from custody in a foreign country and "ensure that his case is handled as it would have been had he not been improperly sent to El Salvador"). The government concedes, for example, that it could not have removed Bonilla Alvarez to El Salvador, Draft Hr'g Tr. at 4, and Bonilla Alvarez suggests U.S. officials had knowledge that is exactly what Mexico would do, so as to effectively construct an illegal removal to El Salvador. *See id.* at 8. Bonilla Alvarez also argues that his removal to Mexico was itself improper. ECF No. 7 ¶¶ 27–29; *cf. Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153, 2157 (2025) (Sotomayor, J., dissenting) (noting government agreed to comply with order to facilitate return of plaintiff who was removed to Mexico without notice and from there had been deported to Guatemala, where he feared torture and persecution). But the record on these points is not developed either. Indeed, even the government indicates it is not fully certain about its control or role as it relates to Bonilla Alvarez in particular. ECF No. 9-1 at 4; *see also* Draft Hr'g Tr. at 24 (government counsel assigned to case was not aware that Bonilla Alvarez had been removed and unable to confirm whether removal was a mistake). The Court cannot conclude on this record that it has jurisdiction to order relief as to someone who is no longer within the United States. And that is so even if the consequences of the government's actions

appear dangerous and inhumane, and may lead to something it could not do directly. *See D.A.*, 2025 WL 2646888, at \*2.

## III.    Conclusion

For these reasons, Bonilla Alvarez's motion for a temporary restraining order and order to show cause, ECF No. 7, is denied. The parties shall meet, confer, and file a joint status report by October 1, 2025, proposing next steps in this action, including, to the extent relevant, proposed briefing schedules for any motions either party wishes to raise.


/s/ Amir H. Ali
_____

AMIR H. ALI
United States District Judge

Date:    September 28, 2025